IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| SUZANNE WOZNIAK | : | CIVIL ACTION |
| | : | |
| v. | : | |
| | : | |
| KILOLO KIJAKAZI, Acting | : | NO. 22-2523 |
| Commissioner of Social Security | : | |

**MEMORANDUM AND ORDER**

ELIZABETH T. HEY, U.S.M.J.                                                                 January 18, 2024

      Suzanne Wozniak ("Plaintiff") seeks review of the Commissioner's decision denying her application for supplemental security income ("SSI"). For the reasons that follow, I conclude that the decision of the Administrative Law Judge ("ALJ") is not supported by substantial evidence. Therefore, I remand the case for further proceedings pursuant to sentence four of 42 U.S.C. § 405(g).

**I.     PROCEDURAL HISTORY**

      I begin with the decision on Plaintiff's prior application, as it forms the backdrop for the current appeal. On December 21, 2017, ALJ Benjamin Chaykin found Plaintiff disabled beginning on February 27, 2016, based on an application she protectively filed on May 7, 2015. Tr. at 57-68. Although Plaintiff met the medical requirements to qualify for SSI, id. at 68, she was found ineligible for SSI from February 2016 through January 2018, because she had excess resources. Id. at 34-35, 205-06, 215-37.[1] Each of the monthly notices to Plaintiff, which are included in the record, indicates that Plaintiff

---

[1]Because the prior administrative record was not included in the record of the current case, I rely on ALJ Chaykin's decision regarding the medical evidence he reviewed.

may become eligible for SSI benefits if her resources are reduced below $2,000. See, e.g., id. at 215.

On December 17, 2019,[2] Plaintiff protectively filed another application for SSI, alleging that she became disabled on April 1, 2019, as a result of a fractured neck, Sjogren's Syndrome, and Immune Thrombocytopenic Purpura ("ITP"). Tr. at 86, 241-42, 279.[3] The application was denied on February 14, 2020, because Plaintiff had resources in excess of $2,000. Id. at 36, 107-11. Plaintiff filed a request for reconsideration (dated March 5, 2020), claiming that her assets are worth less than $2,000. Id. at 116. On August 25, 2020, the Social Security Administration notified Plaintiff that she did not meet the medical (disability) requirements for SSI. Id. at 122-26. On September 3, 2020, Plaintiff requested reconsideration, id. at 128-29, but was again denied on November 16, 2020. Id. at 131-34. Plaintiff requested an administrative hearing, see id. at 137-39, which took place on March 4, 2021. Tr. at 28-52. The day before the hearing, Plaintiff's representative submitted a brief to the ALJ, amending her onset date to her protective filing date (Dec. 17, 2019), id. at 443, and requesting that exhibits from the prior administrative record be included in the record of the current

---

[2] Bank records included in the current administrative record indicate that Plaintiff's resources may have fallen below the permissible maximum in December 2019. Tr. at 261. Plaintiff later amended the alleged onset date to December 17, 2019. Id. at 443.

[3] I will define the relevant medical terms in discussing the medical evidence. In addition to the conditions Plaintiff listed on the Disability Report, at the administrative hearing, Plaintiff's representative included cervical and lumbar degenerative disease, an affective disorder, and a personality disorder that has manifested in a hoarding compulsion in his list of Plaintiff's impairments. Tr. at 38.

application. Id. at 444-45. On March 26, 2021, ALJ Regina L. Warren found Plaintiff was not disabled. Id. at 10-18. On April 26, 2022, the Appeals Council denied Plaintiff's request for review, id. at 1-3, making the ALJ's March 26, 2021 decision the final decision of the Commissioner. 20 C.F.R. § 416.1484(a). Plaintiff commenced this action in federal court on June 28, 2022, Doc. 1, and the matter is now fully briefed and ripe for review. Docs. 10-13.[4]

## II. LEGAL STANDARDS

To prove disability, a claimant must demonstrate an "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment . . . which has lasted or can be expected to last for . . . not less than twelve months." 42 U.S.C. § 423(d)(1). The Commissioner employs a five-step process, evaluating:

> 1. Whether the claimant is currently engaged in substantial gainful activity;
>
> 2. If not, whether the claimant has a "severe impairment" that significantly limits her physical or mental ability to perform basic work activities;
>
> 3. If so, whether based on the medical evidence, the impairment meets or equals the criteria of an impairment listed in the listing of impairments ("Listings"), 20 C.F.R. pt. 404, subpt. P, app. 1, which results in a presumption of disability;
>
> 4. If the impairment does not meet or equal the criteria for a listed impairment, whether, despite the severe

---

[4]The parties consented to magistrate judge jurisdiction pursuant to 28 U.S.C. § 636(c). See Standing Order, In RE: Direct Assignment of Social Security Appeals to Magistrate Judges – Extension of Pilot Program (E.D. Pa. Nov. 27, 2020); Doc. 6.

>impairment, the claimant has the residual functional capacity ("RFC") to perform her past work; and
>
>5. If the claimant cannot perform her past work, then the final step is to determine whether there is other work in the national economy that the claimant can perform.

See Zirnsak v. Colvin, 777 F.3d 607, 610 (3d Cir. 2014); see also 20 C.F.R. § 404.1520(a)(4). Plaintiff bears the burden of proof at steps one through four, while the burden shifts to the Commissioner at the fifth step to establish that the claimant is capable of performing other jobs in the local and national economies, in light of her age, education, work experience, and RFC. See Poulos v. Comm'r of Soc. Sec., 474 F.3d 88, 92 (3d Cir. 2007).

The court's role on judicial review is to determine whether the Commissioner's decision is supported by substantial evidence. 42 U.S.C. § 405(g); Schaudeck v. Comm'r of Soc. Sec., 181 F.3d 429, 431 (3d Cir. 1999). Therefore, the issue in this case is whether there is substantial evidence to support the Commissioner's conclusion that Plaintiff is not disabled. Substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion," and must be "more than a mere scintilla." Zirnsak, 777 F.2d at 610 (quoting Rutherford v. Barnhart, 399 F.3d 546, 552 (3d Cir. 2005)); see also Biestek v. Berryhill, 587 U.S. __, 139 S. Ct. 1148, 1154 (2019) (substantial evidence "means only – 'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion'") (quoting Consol. Edison Co. v. NLRB, 305 U.S. 197, 229 (1938)). The court has plenary review of legal issues. Schaudeck, 181 F.3d at 431.

## III. DISCUSSION

### A. ALJ's Findings and Plaintiff's Claims

In the decision under review, the ALJ found Plaintiff had the severe impairments of a fracture of the C2 vertebrae, degenerative disc disease ("DDD"), and osteoporosis. Tr. at 12-13. The ALJ found Plaintiff's Sjogren's Syndrome, ITP, major depressive disorder ("MDD"), hoarding disorder, obsessive-compulsive disorder ("OCD"), and post-traumatic stress disorder ("PTSD") to be non-severe. Id. at 12-13. The ALJ found that Plaintiff did not have an impairment or combination of impairments that met the Listings, id. at 14, and that she had the RFC to perform light work except that she could occasionally climb stairs, balance, and crawl; push, pull, stoop, kneel, and crouch on an unlimited basis; and should not climb ladders and avoid vibrations, unprotected heights and hazards. Id. at 15. Based on the testimony of a vocational expert ("VE"), the ALJ found that Plaintiff could perform her past relevant work as a radiologic technologist as generally and actually performed. Id. at 18. Therefore, the ALJ found that Plaintiff was not disabled. Id.

Plaintiff claims the ALJ erred by failing (1) to include exhibits from the prior file in the administrative record without an explanation for the failure, and (2) to accommodate mental limitations she found credible or explain her failure to include corresponding limitations in her RFC assessment. Doc. 10 at 2-13. In addition, Plaintiff claims the ALJ and members of the Appeals Council were not properly appointed under the Federal Vacancies Reform Act and the Appointments Clause of the Constitution. Id. at 13-14; Doc. 12. Defendant responds that the evidence from the earlier proceeding was

irrelevant, predating the relevant period by two years, and subject to res judicata. Doc. 11 at 2, 7-10. In addition, Defendant argues that substantial evidence supports the ALJ's evaluation of Plaintiff's mental impairments. Id. at 11-15. Finally, Defendant argues that the ALJ and Appeals Council judges had authority to decide the case. Id. at 15-28; Doc. 13.

### B. Plaintiff's Claimed Limitations and Testimony at the Hearing

Plaintiff was born on February 28, 1966, and thus was 53 years old at her amended disability onset date (December 17, 2019), and 55 years old at the time of the ALJ's decision (March 26, 2021). Tr. at 251. Plaintiff completed two years of college, described as x-ray school at the hearing, and has worked as an x-ray and mammography technologist. Id. at 39-40, 280, 308. At the administrative hearing, Plaintiff explained that she is unable to work due to a combination of fatigue, exhaustion, pain, and a propensity for severe falls. Id. at 41. Her ITP has caused "a lot of fatigue and chronic exhaustion" and she has "a lot of pain" in her back, arms, and legs, with five severe falls in the prior two years. Id. Plaintiff testified that she can stand approximately 10 -to- 15 minutes before she has severe pain in her lower back and loses her balance, and can walk about a block and uses a cane at times. Id. at 41-42. In addition, Plaintiff suffers from generalized weakness. Id. at 43.

Plaintiff testified that she has fallen several times because she has lost her balance. Tr. at 46. Plaintiff fractured her neck when she fell from a ladder in her bathroom, and, in another incident, spent 24 hours on the floor in her bedroom after falling. Id. at 45.

With respect to Plaintiff's mental health conditions, she described her hoarding disorder, noting that she has pathways to walk around her home with clothes piled up in bags and boxes. Tr. at 44. Plaintiff has sought treatment at the Wedge and Merakey to help with the hoarding problem, but it has not been successful. Id. at 44-45.

At the hearing, a VE classified her past work as a radiology technician as light, skilled work. Tr. at 47. The ALJ asked the VE to consider someone of Plaintiff's age, education, and work experience, who was limited to light work; who could stand and walk for six hours and sit for six hours; perform unlimited pushing and pulling, stooping, kneeling, crouching; occasional climbing stairs, balancing, and crawling; with no climbing ladders and avoiding unprotected heights, hazards, and vibration. Id. The VE testified that the person could perform Plaintiff's past relevant work as a radiologist technician and could perform the jobs of laundry folder, laminating machine operator, or inserting machine operator. Id. at 47-48.[5]

---

[5]During this questioning, the ALJ noted that if Plaintiff were limited to sedentary work the Medical-Vocational Guidelines ("Grids") would direct a finding of disabled. Tr. at 50.

C.      **Summary of the Medical Record**

Plaintiff has a history of ITP,[6] for which she was treated with Rituxan[7] in 2011, and monitored by Jefferson Medical Oncology. Tr. at 1030. In addition, Plaintiff has a history of Sjogren's Syndrome[8] and osteoporosis established by DEXA scan in 2011, for which she is treated with Prolia injections.[9] Id. at 557, 784, 1030.

Plaintiff's falls are documented in the medical record. On November 28, 2018, Plaintiff reported to Amy Mackenzie, M.D., at Jefferson's Medical Oncology department that she had fallen in her bedroom in August and could not get up, was treated for

---

[6] ITP "is an illness that can lead to bruising and bleeding. Low levels of the cells that help blood clot, known as platelets, most often cause the bleeding." See https://www.mayoclinic.org/diseases-conditions/idiopathic-thrombocytopenic-purpura/symptoms-causes/syc-20352325#:~:text=Immune%20thrombocytopenia%20(ITP)%20is%20an,ITP%20can%20cause%20purple%20bruises. (last visited Jan. 10, 2024).

[7] Rituxan is a cancer medicine that interferes with the growth and spread of cancer cells in the body and used to treat other autoimmune diseases including rheumatoid arthritis and pemphigus vulgaris. See https://www.drugs.com/rituxan.html (last visited Jan. 10, 2024).

[8] "Sjogren's syndrome is a disorder of your immune system identified by its two most common symptoms – dry eyes and a dry mouth. The condition often accompanies other immune system disorders . . . . In Sjogren's syndrome, the mucous membranes and moisture-secreting glands of your eyes and mouth are usually affected first – resulting in increased tears and saliva." See https://www.mayoclinic.org/diseases-conditions/sjogrens-syndrome/symptoms-causes/syc-20353216 (last visited Jan. 10, 2024).

[9] Prolia is a monoclonal antibody used to treat osteoporosis in people who are at high risk for broken bones and who cannot use other osteoporosis medications. See https://www.drugs.com/prolia.html (last visited Jan. 10, 2024).

rhabdomyolysis[10] at Presbyterian Hospital and spent two weeks in rehabilitation after her hospitalization. Id. at 1080-81; see also id. at 985 (9/26/18 – Plaintiff reported to Merakey that she fell in her home three weeks ago and was found 24 hours later and hospitalized).[11] Dr. Mackenzie recommended outpatient physical therapy for increased strengthening. Id. at 1086. When Dr. Mackenzie saw Plaintiff on February 27, 2019, the note indicates "[a] diagnosis of Weakness generalized," and that Plaintiff was "[p]ositive for fatigue." Id. at 1087.[12] In the Assessment/Plan, the doctor noted "Patient with poor core strength and inability to get up from a fall," and ordered a referral for physical therapy. Id. at 1092. Plaintiff's fatigue and weakness remained a concern of Dr. Mackenzie for the remainder of the treatment notes she provided. See id. at 1094 (6/26/19), 1101 (10/16/19), 1109 (5/13/20).

Plaintiff began physical rehabilitation in March 2019, and continued until June 2019. Tr. at 593-668. During this time, the treatment providers noted that Plaintiff's ability to stand and walk was limited and she had decreased strength, range of motion, endurance, mobility, coordination, and cognition, and her balance was impaired. See,

---

[10]Rhabdomyolysis is "disintegration or dissolution of muscle, associated with the excretion of myoglobin." Dorland's Illustrated Medical Dictionary, 32nd ed. (2012) ("DIMD") at 1637.

[11]The related hospital and rehabilitation notes are not contained in the record.

[12]Plaintiff had previously complained to Dr. Mackenzie about feeling tired, cold, and fatigued. Tr. at 1054 (2/14/17), 1060, 1063, 1065 (5/31/17 – and noting a fall in May 2017 with a concussion and Plaintiff appearing cachectic). Cachexia is defined as a profound state of constitutional disorder, such as general ill health and malnutrition. DIMD at 268.

e.g., id. at 627, 629 (5/15/19 – improving to 20 minutes tolerance standing, able to tolerate 3 blocks walking, decreased strength, range of motion, endurance, mobility, coordination, cognition and impaired balance), 652 (6/12/19 – "struggling to complete task today due to fatigue), 659 (6/19/19 – only able to lift light objects, positive for fatigue, limited mobility

On May 8, 2019, Plaintiff tripped and fell in a store and hit her head. Tr. at 722. CT scans of her head and cervical spine revealed only soft-tissue swelling, and x-ray of her elbow established no fracture. Id. at 724-25.[13] The laceration to her scalp was repaired with three staples. Id. at 725. In July 2019, Plaintiff complained of pain in her chest after falling into a pool at a swim club. Id. at 955. Chest x-rays revealed old healed left rib fractures, id. at 554, and a CT scan of the chest was normal. Id. at 561.

On November 8, 2019, Plaintiff was seen at Methodist Hospital two days after falling two or three rungs from a ladder, and she was transferred to the Jefferson Health Emergency Department. Tr. at 455, 466. A CT scan revealed a cervical small non-displaced fracture at C2 and contusions at T3 and T4. Id. at 455, 465-66, 482. She was released with a hard neck collar. Id. at 454. After this fall, Plaintiff began physical therapy on January 14, 2020, complaining of hearing a clicking and popping in her neck upon movement and neck pain. Id. at 669. The physical therapist noted limited cervical range of motion, muscle weakness and imbalance. Id. at 671. When the "popping" in Plaintiff's neck increased in late January 2020, her therapy was on hold pending

---

[13]The treatment note indicates that "[b]ones appear demineralized, limiting the ability to detect subtle fractures." Tr. at 724.

consultation with her doctor, and resumed on March 3, 2020, and ended on March 10, 2020, with the last assessment indicating that Plaintiff had improved neck strength and stability. Id. at 703, 710.

On December 1, 2020, Plaintiff went to Penn Medicine's Emergency Room after falling when she missed a step. Tr. at 899. She complained of neck pain, arthralgias, and a headache. Id. at 897. On examination, Plaintiff had tenderness over the right shoulder and right humerus, but x-rays were negative. Id. at 897-99. When Plaintiff followed up with her primary care physician Rita Carabello, M.D., the doctor noted left shoulder bruising and prescribed Voltaren.[14] Id. at 939-40.

Throughout this period, Plaintiff routinely saw Dr. Carabello who prescribed Klonopin, Lexapro, and Abilify[15] for Plaintiff's anxiety and depression. See, e.g., tr. at 976 (6/10/15), 970 (8/17/16), 964 (11/8/17), 961 (11/5/18), 958 (5/15/19 – staples removed), 955 (7/30/19 – chest pain after fall, x-ray ordered), 950 (11/22/19 – follow up after fall from ladder), 947 (2/20/20), 942 (11/19/20), 939 (12/8/20 – follow up after fall). In the treatment notes for the February 20, 2020 visit, Dr. Carabello noted that Plaintiff "is unable to work due to physical and mental disability, [patient] is unable to function

---

[14]Voltaren is a nonsteroidal anti-inflammatory drug used to reduce pain and inflammation. See https://www.drugs.com/voltaren.html (last visited Jan. 17, 2024).

[15]Klonopin is a benzodiazepine used to treat certain seizure disorders and to treat panic disorder including agoraphobia. See https://www.drugs.com/klonopin.html (last visited Jan. 11, 2024). Lexapro is an antidepressant. See https://www.drugs.com/lexapro.html (last visited Jan. 11, 2024). Abilify (generic aripiprazole) is an antipsychotic used to treat psychotic conditions including schizophrenia and is used with a antidepressants to treat MDD. See https://www.drugs.com/abilify.html (last visited Jan. 11, 2024).

due to her mental instability, she is not able to work due to this disability." Id. at 948. In addition, in the treatment note for November 19, 2020, Dr. Carabello stated "due to mental illness and her chronic rheum issues she is not able to maintain work, she has trouble with simple adl[s] on some days due to pain [and] swelling . . . . It is my opinion that she is unable to work." Id. at 943.

With respect to mental health treatment, although there are references to Plaintiff's treatment at the Wedge in 2015, see tr. at 985, 989, no treatment notes are contained in the record from the Wedge. Plaintiff did treat with Merakey from September through December 2018. Id. at 979-1025. Plaintiff was diagnosed with MDD, recurrent, moderate, hoarding disorder, OCD, and PTSD. Id. at 979. Plaintiff described herself to Merakey as a hoarder. Id. at 985. As previously mentioned, at the hearing Plaintiff described having pathways to walk around her home with clothes piled up in bags and boxes. Id. at 44. She told her therapist that the firefighters who found her when she fell at home in August 2018, "said they had to make a report on the conditions in her home." Id. at 985. The therapist's notes describe her condition as follows:

> [W]hen she finds something she likes, she feels compelled to buy it in every color it comes in. She also saves worthless items such as cereal and cracker boxes. She pulled out an envelope from her purse to show something she had saved that was of little value. She said "I don't want to throw anything out."

Id. In addition, the therapist noted Plaintiff's focus and anger toward her family, who had started cleaning out her house when she was hospitalized after falling. Id. at 995,

999. Rather than cleaning out her house, she was staying with a friend whose home had no heat. Id. at 995, 999, 1001.

On July 27, 2020, David Klebanoff, M.D., conducted a consultative internal medicine examination, and the physical examination was normal except that Plaintiff was unable to do a full squat. Tr. at 759, 761-62. Dr. Klebanoff determined that Plaintiff could continuously lift and carry up to 20 pounds and occasionally lift and carry 21-50 pounds. Id. at 764. The doctor also found Plaintiff could sit for 8 hours a day, and stand and walk for 6 hours each in 2-hour increments. Id. at 765.[16] In addition, Dr. Klebanoff found that Plaintiff could occasionally climb stairs, ramps, ladders, and scaffolds, kneel, crouch, and crawl, and frequently balance and stoop. Id. at 767.

On August 10, 2020, at the initial consideration stage, Ruth Myers Arnold, D.O., found from a review of the records that Plaintiff could occasionally lift and carry 20 pounds and frequently lift and carry 10 pounds; stand and/or walk 6 hours and sit for 6 hours in an 8-hour workday. Tr. at 80. On August 14, 2020, Karen Evelyn Weitzner, Ph.D., found from her review of the records that Plaintiff suffers from depressive, bipolar, and related disorders, which result in "minimal" impairment, with mild limitation in her abilities to understand, remember, or apply information; concentrate, persist, or maintain pace; and adapt or manage oneself; and no limitations in her ability to interact with others. Id. at 78-79.

---

[16]In the Medical Source Statement, the doctor indicated that Plaintiff is right-handed, tr. at 766, but in the narrative portion, he correctly notes that Plaintiff is left-handed. Id. at 761.

13

At the reconsideration stage, David John Ferner, D.O., found exertional limitations consistent with those found at the initial consideration stage. Tr. at 98-100. John David Gavazzi, Psy.D., found that Plaintiff suffered from depressive, bipolar, and related disorders that were not severe and had no limitations in her abilities to understand, remember, or apply information, and interact with others, and mild limitation in the abilities to concentrate, persist, or maintain pace, and adapt or manage oneself. Id. at 95.

### D. Plaintiff's Claims

#### 1. Failure to Include Exhibits from Prior Administrative Record

Plaintiff's primary contention is that the ALJ failed to include exhibits from the prior file in the current administrative record. Because I find that the ALJ's decision is not supported by substantial evidence based on the record presented, I do not find it necessary to discuss this issue in depth. As noted, prior to the administrative hearing, Plaintiff's representative requested the ALJ to include exhibits from the prior disability determination in the current record, specifically referencing records from the Wedge, Dr. Carabello, and a Dr. Langman that were not included in the present record. Tr. at 444. Defendant argues that Plaintiff's agreement that the record could be closed at the end of the administrative hearing effectively waived the request for the additional records. Doc. 11 at 10 (citing tr. at 33). Close review of the transcript, however, puts Defendant's argument in doubt. At the hearing, the ALJ asked Plaintiff's representative if he had any "new exhibits that need to be offered into evidence," to which Plaintiff's representative responded in the negative, and the ALJ admitted the exhibits that are currently in the

14

record. Tr. at 33. Plaintiff's representative likely did not consider the exhibits from the prior proceeding "new." Again, because I find that the ALJ's decision is not supported by substantial evidence upon the current record, I will remand the case for further consideration, including inclusion of the exhibits from the prior application requested by Plaintiff.[17]

2. Consideration of Mental Limitations

Plaintiff also complains that the ALJ failed to include limitations in the RFC assessment to account for the mental limitations she found in considering the Paragraph B criteria of the mental health listings at Step 3. Doc. 10 at 5-13. Defendant responds that substantial evidence supports the ALJ's evaluation of her mental impairments. Doc. 11 at 11- 15. I conclude that the ALJ's consideration of the mental health treatment evidence is deficient.

"The ALJ must consider all the evidence and give some reason for discounting the evidence she rejects." Plummer v. Apfel, 186 F.3d 422, 429 (3d Cir. 1999) (citing

---

[17]There may be a more fundamental flaw with the case. As explained, Plaintiff had previously been found medically disabled, but not entitled to SSI benefits because her assets exceeded the allowable limit. The Notice of Award indicates that Plaintiff is eligible for SSI as of February 2017, but that her monthly payment is $0.00 based on the value of her assets. Tr. at 205. The Notice also instructs Plaintiff to contact her local Social Security office to report a change in resources. Id. at 207. Rather than filing a new application for SSI, there may have been a different mechanism to alert Defendant of Plaintiff's change in financial status. Considering the non-adversarial nature of social security proceedings, see Sims v. Apfel, 530 U.S. 103, 110-11 (2000) ("Social Security proceedings are inquisitorial rather than adversarial. It is the ALJ's duty to investigate the facts and develop the arguments both for and against granting benefits."), it is incumbent upon Defendant to determine if Plaintiff properly filed a new application or if her change in financial circumstances should have been addressed through a different procedure.

Stewart v. Sec'y HEW, 714 F.2d 287, 290 (3d Cir. 1983)).  When there is a conflict in the evidence, the ALJ may choose which evidence to credit and which evidence not to credit, so long as she does not "reject evidence for no reason or for the wrong reason." Rutherford v. Barnhart, 399 F.3d 546, 554 (3d Cir. 2005) (citing Mason v. Shalala, 994 F.2d 1058, 1066 (3d Cir. 1993)); see also Plummer, 186 F.3d at 429.

Here, although the ALJ acknowledged Plaintiff's diagnoses of MDD, hoarding disorder, OCD, and PTSD, she dismissed the treatment notes from Merakey, ultimately finding Plaintiff's mental health impairments non-severe.

> [Plaintiff] testified that she experiences mental health issues including anxiety and depression.  Her primary care provider notes show that she was prescribed medication for depression at least three years prior to filing her application for benefits ([tr. at 970]).  She started mental health treatment in September 2018 for diagnoses of [MDD], hoarding disorder, [OCD], and [PTSD] ([id. at 979]).  She last attended treatment in December 2018, a year before filing her application for benefits ([id. at 1019]).  During the three months she was in treatment, her mental status exams showed cooperative behavior, appropriate affect, logical thought processes, normal speech, fair judgment, fair insight, normal memory, and normal attention and concentration. ([id. at 988-89, 1022, 1024]).  [Plaintiff's] medically determinable mental impairments do not cause more than minimal limitation in [Plaintiff's] ability to perform basic mental work activities and [are] therefore nonsevere.

Tr. at 13.

The ALJ's statement that Plaintiff was prescribed medication for depression "at least three years prior to filing her application for benefits" implies that she had not applied for benefits until her conditions became disabling.  This ignores the fact that Plaintiff had already been found disabled and was disqualified from receiving benefits

16

based on her assets.[18] Moreover, the ALJ's reliance on the mental status examination findings from Merakey ignores the narrative notes that indicate that Plaintiff's hoarding disorder resulted in firefighters reporting the conditions in her house when she was rescued after falling in her house in August 2018, and the fact that Plaintiff was living with a friend who had no heat to avoid facing the effects of her hoarding at her home.

In addition, the ALJ relied on the assessments of the record reviewers at the initial and reconsideration levels in determining Plaintiff's limitations in the B criteria of the mental health listings. Tr. at 13. The problem is that neither Dr. Weitzner nor Dr. Gavazzi had the benefit of the Merakey treatment notes and neither acknowledged diagnoses beyond depressive disorder, NOS. See id. at 74-76 (listing evidence with no mention of Merakey), 78-79 (acknowledging diagnosis of depressive disorder only), 90-93 (listing evidence with no mention of Merakey), 95 (Plaintiff "presents with Depressive Disorder NOS. . . . [Plaintiff] does not participate in psychotherapy. [Plaintiff] is stable with medication."). As previously discussed, the narrative treatment notes from Merakey establish diagnoses of hoarding disorder, PTSD, and OCD, along with MDD, and evidence the severity of Plaintiff's hoarding disorder.

---

[18]The December 2017 ALJ opinion found Plaintiff's mental disorders to be severe, and the RFC included corresponding limitations. Tr. at 60, 62.

Thus, I find that the ALJ did not properly consider the evidence relating to Plaintiff's mental health impairments and will remand the case for further consideration.[19]

## IV.   CONCLUSION

Plaintiff presents an unusual case where she had previously been found disabled but could not receive SSI benefits based on her assets. With the depletion of her assets, she again sought benefits. The ALJ considered Plaintiff's disability to have begun on her protective filing date despite the fact that she had previously been found disabled and failed to incorporate the records from the prior administrative proceeding in this record. Based on the favorable disability determination in December 2017, and the description of the exhibits in that decision, those exhibits would have provided context for statements in the current record, including Plaintiff's primary care physician's opinion that Plaintiff was disabled.

In any event, as explained the ALJ in this case did not properly consider the evidence regarding Plaintiff's mental health impairments. Although Plaintiff's substantive challenge was to the consideration of the mental health treatment evidence, I remand the case for further development of the record with respect to her mental and physical impairments. If the exhibits from the prior proceeding are not available,

---

[19] Plaintiff also claims that the ALJ and Appeals Council Judges had no legal authority to adjudicate the case because they were not properly appointed under the Federal Vacancies Reform Act and the Appointments Clause of the Constitution. Doc. 10 at 13-14; Doc. 12. Because I find that the case must be remanded, I have no need to address this issue.

Plaintiff should be given the opportunity to obtain RFC assessments from her treatment providers. Moreover, as explained, supra n.17, considering the unusual procedural posture of this case, it is incumbent upon Defendant to determine if Plaintiff properly filed a new application or if her change in financial circumstances should have been addressed through a different procedure.

     An appropriate Order follows.